[Cite as *State v. Jackson*, 2020-Ohio-4914.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                               :

    Plaintiff-Appellant,             :

                              No. 108558

    v.                               :

ANDRE JACKSON,                               :

    Defendant-Appellee.              :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** October 15, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-87-221195-ZA

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Christopher D. Schroeder, Assistant Prosecuting Attorney, *for appellant.*

Timothy Young, Ohio Public Defender, Kathryn L. Sandford and Randall L. Porter, Assistant State Public Defenders, *for appellee.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Pursuant to R.C. 2945.67(A), plaintiff-appellant, the state of Ohio, appeals the trial court's decision that granted the postconviction petition of defendant-appellee, Andre Jackson, and vacated the death sentence. For the

reasons that follow, we reverse the trial court's decision and remand for the trial court to determine whether Jackson is intellectually disabled under the new standard established in *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616.

## I.   Procedural Background

{¶ 2}   Jackson was sentenced to death for the 1987 brutal murder of Emily Zak.  The facts of the case, which are not in dispute, can be found in both this court's decision affirming Jackson's convictions on direct appeal, *State v. Jackson*, 8th Dist. Cuyahoga No. 55758, 1989 Ohio App. LEXIS 5064 (Oct. 5, 1989), and the Ohio Supreme Court's decision affirming the same, *State v. Jackson*, 57 Ohio St.3d 29, 565 N.E.2d 549 (1991).

{¶ 3}   After exhausting all state-court appeals, Jackson filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio.  In 2001, the district court denied his petition.  *Jackson v. Anderson*, 141 F.Supp.2d 811, 830 (2001).  Jackson appealed that decision to the Sixth Circuit Court of Appeals.

{¶ 4}   In June 2002, while Jackson's case was pending in the Sixth Circuit, the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibited the execution of an intellectually disabled offender. *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).  The Supreme Court did not define "intellectual disability"; rather, the court left "'to the states the task of developing appropriate ways to enforce the constitutional

restrictions'" announced in *Atkins*. *Id.* at 317, quoting *Ford v. Wainwright*, 477 U.S. 399, 416-417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

{¶ 5} The Ohio Supreme Court developed procedures and substantive standards for adjudicating *Atkins* claims in *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011. The court adopted a three-part test that defined "intellectual disability" as (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18. *Id.* at ¶ 12. The court further noted that "IQ tests are one of many factors that need to be considered; they alone are" insufficient "to make a final determination on this issue." *Id.* Accordingly, the court held "that there is a rebuttable presumption that a defendant is not [intellectually disabled] if his or her IQ is above 70." *Id.*

{¶ 6} The *Lott* court also set forth the following guidance and standard:

> In considering an *Atkins* claim, the trial court shall conduct its own de novo review of the evidence in determining whether the defendant is [intellectually disabled]. The trial court should rely on professional evaluations of [a defendant's] mental status, and consider expert testimony, appointing experts if necessary, in deciding this matter. The trial court shall make written findings and set forth its rationale for finding the defendant [intellectually disabled] or not [intellectually disabled].

*Id.* at ¶ 18.

{¶ 7} For defendants, such as Jackson, who are already on death row, the court found that *Atkins* was a new decision of the United States Supreme Court that applied retroactively. *Id.* at ¶ 17, citing R.C. 2953.23(A)(1)(b). "For all other

defendants who have been sentenced to death, any petition for postconviction relief specifically raising an *Atkins* claim must be filed within 180 days of the judgment in this case." *Id* at ¶ 24.

{¶ 8} On May 9, 2003, Jackson timely filed his petition raising an *Atkins* claim. In response, the trial court referred Jackson to the Cuyahoga County Psychiatric Clinic for an evaluation to determine whether he was intellectually disabled. Dr. Michael Aronoff interviewed and evaluated Jackson for the sole purpose of his *Atkins* claim. On October 17, 2003, Dr. Aronoff submitted his report to the court opining that "Jackson is not [an intellectually disabled] individual."

{¶ 9} In 2007, the state moved for summary judgment based on Dr. Aronoff's expert report. Jackson opposed the motion. In 2009, the trial court denied the state's motion, finding that a genuine issue of material fact existed as to whether Jackson is intellectually disabled. In 2016, following a request by the Sixth Circuit for a status update, the trial court scheduled a hearing on Jackson's petition.

## II.  *Atkins* Hearing

{¶ 10} In 2017, the trial court conducted a full evidentiary hearing on Jackson's petition. At the hearing, it considered testimony from four experts and considered additional expert reports and affidavits from professionals who had evaluated Jackson over his lifetime. The court also heard lay witness testimony from Jackson's mother, brother, and childhood friend.

## A. Dr. David Smith — Jackson's Expert

{¶ 11} Dr. Smith, a clinical psychologist, testified regarding his expert report and opinion generated following his interview and assessment of Jackson on May 9, 13, and 23, 2016, at the Chillicothe Correctional Institution.

{¶ 12} Testing for intellectual functioning, Dr. Smith administered to Jackson the Stanford-Binet Intelligence Test, Fifth Edition (2003) ("S-BV"). On the S-BV, Jackson obtained a full-scale intelligence quotient ("IQ") score of 80. Dr. Smith stated that an average score would be 100, with a standard deviation of 16. According to Dr. Smith, after factoring the standard error of measurement ("SEM"), Jackson's true IQ score would fall between the range of 76-84, with a 95% confidence level. According to Dr. Smith, this score does not currently place him in the intellectual disability range. Based on this result, Dr. Smith opined in his report that Jackson "was found to currently be an individual who does not have intellectual disability * * *." However, Dr. Smith opined that Jackson "functioned in the mild range of intellectual disability at the time of the crime." He stated that Jackson's intellectual functioning has improved as an adult and while incarcerated. Dr. Smith testified about studies and articles that discuss improvements in intellectual functioning of incarcerated and nonincarcerated individuals.

{¶ 13} In assessing adaptive skills, Dr. Smith administered the Vineland Adaptive Behavior Scales, Second Edition Survey Interview Form ("VABS-II"), where Jackson achieved an overall score of 66, which is below two standard deviations from the average of 100, i.e. 70. Dr. Smith also gave Jackson portions of

Ohio Eligibility Determination Inventory ("OEDI"), which is used to determine whether an individual is eligible for disability services. The three areas of the OEDI that Jackson was tested on were "the capacity for independent living, learning, and economic self-sufficiencies." On all three areas, Jackson showed "substantial functional limitations." Dr. Smith opined that Jackson showed adaptive skills deficits.

{¶ 14} Dr. Smith testified about the third criterion for a finding of intellectual disability: that the deficits in intellectual functioning and adaptive behavior skills had an onset prior to the age of eighteen. Dr. Smith found this criterion to be satisfied through the assessment conducted by Dr. Isidore Helfand in 1978 when Jackson was 12 years old.

**B. Dr. Carla Dreyer — State's expert**

{¶ 15} Dr. Dreyer, a clinical psychologist, testified regarding her expert report and opinion generated following her interview and assessment of Jackson on August 3, 2016, at the Chillicothe Correctional Institution. She testified that she administered the Test of Memory Malingering ("TOMM"), Wechsler Adult Intelligence Scale - 4th Edition ("WAIS-IV"), Wide Range Achievement Test - 4th Edition ("WRAT- 4"), and the Adaptive Behavior Assessment Scale - 3d Edition ("ABAS-3"). The TOMM measures effort and malingering, and according to Dr. Dreyer, there was no indication on this test that Jackson malingered.

{¶ 16} On the WAIS-IV, Jackson obtained a full-scale IQ score of 67. Factoring the SEM, Jackson's true IQ fell between a range of 62 and 72, with a 95%

confidence level. She stated that the average score on the WAIS-IV is 100, with a standard deviation of 15. Dr. Dreyer testified that she thought Jackson's score was an underestimate of his real IQ based on the lack of effort he exhibited during the testing and because only three months prior, he obtained an IQ score of 80. Dr. Dreyer opined that the higher score achieved with Dr. Smith would be more reliable.

{¶ 17} Dr. Dreyer testified that she did not believe that someone who was determined to be intellectually disabled in 1987, at the time of the crime, would be "cured" over time because intellectual disability "is a permanent developmental condition," except for individuals who suffer from brain injuries, conditions, or events that "interferes or causes a decline in function." (Tr. 301-303.) It was her opinion that Jackson likely had undiagnosed ADHD as a child, which progressed into a diagnosis of antisocial personality disorder as an adult. According to Dr. Dreyer, these behavioral disorders were a more plausible explanation for Jackson's inconsistent IQ scores. (Tr. 320.)

{¶ 18} Regarding the WRAT-4, which tests academic abilities, Dr. Dreyer testified that Jackson's scores were higher than she anticipated given his performance on the WAIS-IV. For adaptive skills, Dr. Dreyer administered the ABAS-3, where Jackson scored a general adaptive composite score of 81. According to Dr. Dreyer, the individual scores placed Jackson in the low to average range and were consistent with an individual functioning in the low average range, not a person with intellectual disability.

{¶ 19} Dr. Dreyer opined in her report that Jackson "is not intellectually disabled now, nor has he ever met the criteria for an intellectual disability." She opined that Jackson meets the criteria for borderline intellectual functioning and antisocial personality disorder.

### C. Dr. Michael Aronoff

{¶ 20} Dr. Aronoff, a psychologist with the Cuyahoga County Court Psychiatric Clinic, testified about his 2003 assessment of Jackson, which was in response to Jackson's *Atkins* petition and where he was appointed by the court. Dr. Aronoff stated that he reviewed records, interviewed Jackson, and administered IQ and academic achievement testing— the WAIS-III and WRAT-3, respectively.

{¶ 21} On the WAIS-III, Jackson obtained a full-scale IQ score of 76. Dr. Aronoff testified that factoring in the SEM, Jackson's true IQ fell within the range of 71-81. Dr. Aronoff also administered the WRAT-3, which measures academic ability. He reported that Jackson scored in the 13th percentile for reading, an equivalent to that of an 8th grade reading level; 34th percentile for spelling, an equivalent to high school grade level; and 8th percentile for arithmetic, an equivalent to 6th grade level. According to Dr. Aronoff, these performances placed Jackson in the average to borderline ranges.

{¶ 22} Dr. Aronoff reported that Jackson is clinically a complex individual because over the years, "various reports offer contradictory and inconsistent conclusions." His diagnostic impression determined that Jackson is borderline intellectual functioning, not intellectually disabled. He stated that his testing

revealed that Jackson did not satisfy the first *Lott* factor of subaverage intellectual functioning because Jackson did not render a score below 70 even considering the SEM. Accordingly, Dr. Aronoff stated that he did not perform adaptive skills testing, instead conceding "to Dr. Everington's results [on adaptive skills] because I had nothing to rebut it." (Tr. 381.)

{¶ 23} Dr. Aronoff also noted that Jackson's IQ results reported by Dr. Schmidtgoessling in 1992 "were also within the borderline range." However, at the hearing, Dr. Aronoff agreed that the 68 IQ score in 1972 and the 72 IQ score in 1992, after factoring in the SEM, showed significantly subaverage intellectual functioning. (Tr. 392.)

### D. Dr. Nancy Schmidtgoessling

{¶ 24} Dr. Schmidtgoessling, a psychologist in the areas of clinical and forensic psychology, testified that she evaluated Jackson in 1992. Dr. Schmidtgoessling administered to Jackson the Weschler Adult Intelligence Scale - Revised ("WAIS-R") in which he obtained a full-scale IQ score of 72. She testified that the SEM at the time would have been plus or minus three points. (Tr. 418.) Dr. Schmidtgoessling agreed that in 1992 she did not diagnose Jackson as intellectually disabled. (Tr. 422.)

### E. Lay Witnesses

{¶ 25} Jackson's mother and brother, Jacqueline Graham and Derek Jackson, respectively, testified about Jackson's childhood. Graham testified that Jackson was a not a good student, could not stay on task, had problems

communicating, and was unable to learn or process information. She stated that he had impulsive behaviors and would always make jokes or show off to mask inadequacies. Graham stated that Jackson was a rule breaker and punishment was not a deterrent; he often acted unsafely. She stated that he had "no fear" and during childhood he drank bleach once, was scalded by hot water, and twice set the house on fire. Graham further testified that her son could not keep a job and was irresponsible with money.

{¶ 26} Jackson's brother, Derek, testified that Jackson engaged in risky behavior and never appreciated the consequences of his actions. He stated that Jackson did not do well in school, had a short attention span, and could not keep a job. According to Derek, Jackson resented him because Derek achieved better grades even though he was the younger of the two.

{¶ 27} Myron Watson, an attorney and Jackson's childhood friend, testified about Jackson and their friendship during childhood. Watson testified that he believed Jackson masked his intellectual and academic deficiencies by pulling pranks and making jokes as a form of deflection. He stated that Jackson wanted to be part of the popular crowd and was easily influenced. Watson testified that Jackson did not do well in school or graduate, never obtained a driver's license, could not hold a job, never had any money, and could not live on his own. Watson also testified about his 1992 affidavit that was prepared in preparation for Jackson's petition for postconviction relief, in which he averred that Jackson was "bright and capable." Despite agreeing that he made this statement, he did not agree with it and

stated that based on his past relationship with Jackson, Jackson is intellectually disabled.

## F. Expert Reports

{¶ 28} Drs. Smith, Dreyer, and Aronoff each reported that they reviewed other prior expert reports and affidavits that were provided to them by counsel. Specifically, those documents included (1) a Court Psychiatric Evaluation report dated May 9, 1978, prepared by Dr. Isidore Helfand; (2) an affidavit prepared by Dr. Caroline Everington following her evaluation of Jackson in 1992; and (3) an affidavit prepared by Dr. James C. Tanley following his evaluation of Jackson in 1992.

### 1. Dr. Isidore Helfand

{¶ 29} In 1978 when Jackson was age 12, Dr. Helfand evaluated him at the Court Psychiatric Clinic in juvenile court. Dr. Helfand interviewed Jackson and conducted the Weschler Intelligence Scale for Children-Revised, from which Jackson achieved a full-scale IQ score of 68. Dr. Helfand reported that Jackson "functions at the [intellectually disabled] range," and that he "would require special education efforts and special educative curriculum."

### 2. Dr. Caroline Everington

{¶ 30} Dr. Everington averred that she assessed Jackson in 1992. She stated that she administered the Quick-Score Achievement Test ("Q-SAT"), which tests academic achievement. On this test, Jackson achieved a general achievement quotient of 77, which according to Dr. Everington is "well below the mean" and

"displays a significant deficit in general knowledge." She opined that Jackson's scores and results "are a characteristic of persons with [intellectual disability]."

{¶ 31} Dr. Everington evaluated Jackson on other adaptive skill areas by administering the Scales of Independent Behavior adaptive skills test. She concluded that Jackson had deficits in the adaptive skill areas of "social, communication, personal living, community living, and broad independence." She averred that considering Jackson's performance on Dr. Schmidtgoessling's prior intelligence test and other academic tests, and his history of developmental delay and probable organic impairment, it was her opinion that Jackson is "functioning within the range of [intellectual disability]."

### 3. Dr. James C. Tanley

{¶ 32} An affidavit from Dr. Tanley, a psychologist and neuropsychologist, was also admitted as an exhibit. He evaluated Jackson in 1992 and administered the Halstead-Reitan Neuropsychological Test Battery, which is designed to detect organic brain dysfunction. Jackson scored 0.6 on the Impairment Index which, according to Dr. Tanley, is within the range consistent with organic brain dysfunction. He opined that because of a mental disease or defect at the time of the offense, Jackson lacked substantial capacity to conform his conduct to the requirements of the law.

{¶ 33} Following the hearing, each party submitted post-hearing briefs for the court to consider. Additionally, the court had all exhibits, including (1) expert reports and affidavits; (2) medical reports and records; (3) school records; (4) trial

court records, partial transcripts, evaluations, and judicial opinions; (5) prison records; and (6) prior lay witness affidavits.  Each expert testified that they reviewed these records in rendering their expert opinions.

## III.  Trial Court's Decision

{¶ 34} To prove intellectual disability, Jackson had to prove by a preponderance of the evidence the following factors: (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18.  *Lott* at ¶ 12.  Additionally, if Jackson's IQ score is above 70, a rebuttable presumption existed that he was not intellectually disabled.  *Id.*

{¶ 35} The trial court's decision stated that it utilized the *Lott* test to determine whether Jackson was intellectually disabled.  However, the trial court also considered and applied updated medical diagnostic that were in effect at the time of the hearing.  Specifically, the court referenced post-*Lott* United States Supreme Court decisions that held that the standard error of measurement is relevant when considering and evaluating IQ scores.

{¶ 36} Initially, the court noted that it considered the testimony from the *Atkins* hearing and the assessments and expert opinions of Drs. Helfand, Schmidtgoessling, Everington, Schmedlen,[1] Smith, and Dreyer.  Although the court

---

[1] Dr. George Schmedlen did not author any report or conduct any evaluation of Jackson.  Rather, Dr. Michael Aronoff conducted the evaluation, authored the report, and testified at trial.  Dr. Aronoff noted in his report that Dr. Schmedlen observed the evaluation.

identified in its decision when each expert performed their respective evaluations and which tests were utilized, the court did not identify the results yielded from those tests.

{¶ 37} The court then addressed each *Lott* factor. In analyzing the first factor — significant subaverage intellectual function — the trial court concluded that Jackson "exhibits substandard intellectual function." It identified that Jackson was administered "six official intelligence tests" over his lifetime, with the most recent occurring in 2016.[2] The court identified that the tests yielded scores ranging from 67 (August 2016) and 80 (May 2016). The court stated that because Jackson's IQ tests were close to 70, and each test has a "standard error of measurement of at least 10," it presumed that Jackson's true IQ is "somewhere between 57-90."[3] The court noted that Jackson's highest and lowest IQ score were achieved in the same year; thus the court stated it would give more weight to "expert opinions and additional evidence provided," and to IQ scores "closer to the time of the offense, rather than those obtained more recently."

{¶ 38} The trial court then discussed Dr. Everington's affidavit that she prepared following her 1992 assessment of Jackson. The court noted that Jackson scored a 77, which according to Dr. Everington, amounted to "basic survival-level

---

[2] The record reveals that Jackson was administered five official intelligence tests.

[3] The SEM of each test ranged from plus or minus 3 to plus or minus 5; thus, Jackson's true IQ score ranged between 62 and 84.

reading and mathematics skills." The court emphasized Dr. Everington's conclusion that Jackson functions "within the range of [intellectual disability]."

{¶ 39} In further consideration of the first *Lott* factor, the court also discussed the report and testimony of Dr. Smith regarding his 2016 assessment of Jackson. The court concluded that "Dr. Smith was likely to obtain a reliable score" from his administration of the S-BV IQ test because of Jackson's concern of being viewed as "retarded." The court noted only that Jackson achieved a score of 80, where the average is 100. The court did not discuss the significance of this score, the presumption that this score represents, or Dr. Smith's opinion that Jackson is not currently intellectually disabled, but was "mildly [intellectually disabled] at the time of the offense."

{¶ 40} Instead, the court stated that "[i]t is influential in our determination that [Jackson] has significantly subaverage intellectual functioning because two of the IQ tests where [Jackson] achieved a score higher than 70, the administering professionals (Dr. Everington and Dr. Smith) still opined that [Jackson] was functioning in the intellectually disabled range." The court also concluded that the "scores are ultimately subaverage for a person of [Jackson's] age." The court also relied on the fact that all professionals who evaluated Jackson "noted that his intellectual functioning was at a lower level than expected for someone of his age range." The court did not discuss any other IQ test results or any other expert's opinion or analysis of Jackson's intellectual functioning, including why the court discounted or did not rely on those scores or opinions.

{¶ 41} As for adaptive skills, the trial court concluded that Jackson "is significantly impaired in the area of adaptive functioning." In making this conclusion, the court stated it relied on and reviewed Dr. Everington's 1992 adaptive skills assessment, Dr. Schmidtgoessling's evaluation, Dr. Smith's adaptive skills evaluation, and the testimony of Jackson's mother, brother, and childhood friend. The court generally stated that "[n]early every professional who evaluated [Jackson] noted a significant or overwhelmingly apparent deficit in some area of adaptive functioning." The court, however, did not specifically identify in which areas of adaptive skills Jackson showed significant limitations.

{¶ 42} Finally, the trial court determined that Jackson's intellectual disability existed prior to the age of 18. The trial court relied on the 1978 evaluation conducted by Dr. Helfand when Jackson was 12 years old, and the lay opinions by Jackson's family and childhood friend. The court relied on Dr. Helfand's opinion that Jackson's IQ score indicated that he was "functioning in the [intellectually disabled] range." Although the court noted that Dr. Helfand did not conduct an adaptive skills assessment, the court found significant Dr. Helfand's conclusion that Jackson "lacked social sensitivity and social awareness" and would "require special education efforts" and more supervision and direction to "mitigate a tendency towards more impulsive, rash behavior." The court found Dr. Helfand's evaluation of poor psychomotor skills indicative of organic or neurological brain deficiencies.

{¶ 43} Accordingly, the trial court concluded that "Jackson has established by a preponderance of the evidence that he is indeed intellectually disabled. The

evidence presented supports a finding that [Jackson] exhibits significant impairments in both intellectual functioning and adaptive skills, and that [Jackson] exhibited this behavior before the age of eighteen." Accordingly, the trial court granted Jackson's petition to vacate his death sentence.

## IV. The Appeal

{¶ 44} The state now appeals this decision, raising two assignments of error.

### A. Standard of Review

{¶ 45} "The procedures for postconviction relief outlined in R.C. 2953.21 et seq. provide a suitable statutory framework for reviewing" an *Atkins* claim by a defendant sentenced to death. *Lott* at 13. The standard for appellate review of postconviction proceedings is abuse of discretion. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. "A trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *Id.*

{¶ 46} "The term 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980); *see also Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "Abuse of discretion" describes a judgment neither comporting with the record, nor reason. *See, e.g., State v. Ferranto*, 112 Ohio St. 667, 676-678, 148 N.E. 362 (1925). Further, an abuse of discretion may be found

when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).

## B. First Assigned of Error — Subaverage Intellectual Functioning

{¶ 47} In its first assignment of error, the state contends that the trial court erred in finding that Jackson showed significantly subaverage intellectual functioning. Although the state raises multiple issues, we find the following issues the most relevant to our decision: (1) the trial court failed to recognize and apply *Lott's* rebuttable presumption that a person with an IQ score above 70 is not intellectually disabled; (2) the trial court erroneously relied on Dr. Everington's assessment as an IQ evaluation; and (3) the trial court's decision is inconsistent with its own findings compared to the evidence.

### 1. *Lott* Standard

{¶ 48} An *Atkins* claim requires proof that the defendant's death sentence violated the Eighth Amendment's proscription against cruel and unusual punishment because the defendant is intellectually disabled. At the time of Jackson's petition and hearing, the relevant criteria for evaluating an *Atkins* claim existed under *Lott*. Under *Lott*, the defendant bears the burden of proving by a preponderance of the evidence (1) significant subaverage intellectual function; (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18. *Lott* at ¶ 12. The *Lott* court also created the rebuttable presumption that a defendant is not intellectually

disabled if the defendant's IQ score is over 70. The court cautioned, however, that an IQ score is merely one measure of intellectual functioning that alone is insufficient to make a final determination on whether a person is intellectually disabled. *Lott* at ¶ 12.

### 2. *Lott's* Presumption of Intellectual Disability

{¶ 49} The first issue the state raises concerns the trial court's failure to recognize and begin its analysis with the rebuttable presumption that a defendant is not intellectually disabled if his IQ is above 70. The state concedes that even if a defendant has an IQ score below 70, it does not mean the defendant was intellectually disabled; it only means the presumption does not apply. *See State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 179.

{¶ 50} In response, Jackson contends that because the trial court cited to *Lott*, and judges are presumed to follow the law, it should be inferred that the court applied the presumption. And because the trial court found him intellectually disabled, Jackson contends that this court can discern that he successfully rebutted the presumption. Finally, Jackson maintains that any error is harmless because under the new standard created in *Ford*, the presumption is now removed.

{¶ 51} The trial court noted that it relied on all expert reports and opinions in considering whether Jackson has significant subaverage intellectual function. However, in addressing this factor, the trial court's decision does not assess the reports or testimony of any witness except Drs. Everington and Smith.

{¶ 52} Although the court recognized that Jackson was subject to "six intelligence tests" throughout his life that yielded scores ranging from 67 to 80, the court only addressed the scores obtained from the "IQ tests" administered by Drs. Everington and Smith. These tests both yielded scores above the presumptive score of 70. The trial court erroneously considered the Q-SAT administered by Dr. Everington as an IQ test, recognizing the score of 77. The only other score the trial court discussed was from the test administered by Dr. Smith, which the trial court determined would reveal a reliable score. Jackson obtained a full-scale IQ score of 80, and even applying the standard error of measurement, Jackson's true IQ score fell in the range between 76 and 84, which is also above the presumption as set forth in *Lott.*

{¶ 53} In Jackson's post-hearing brief, he encouraged the trial court to abandon the *Lott* presumption because "the Supreme Court [in *Lott*] cites no authority for this rebuttable presumption." We recognize that *Ford* has removed this presumption in determining whether someone is intellectually disabled for *Atkins* purposes. However, *Lott* was the standard in place when the court considered Jackson's petition that included a rebuttable presumption that a person with an IQ score over 70 is not intellectually disabled. The trial court did not recognize this presumption in making its determination. And despite Jackson's encouragement to do so, the trial court was not free to disregard the substantive standards announced by the Ohio Supreme Court in *Lott. State v. Bedford*, 1st Dist.

Hamilton No. C-100735, 2011-Ohio-2054, ¶ 20. Accordingly, the trial court should have begun its analysis with the recognition of the *Lott* presumption.

{¶ 54} Jackson maintains that the trial court's ultimate conclusion that he is intellectually disabled reveals that he satisfied of his burden of proof on the *Lott* three-part criteria; thus, rebutting the presumption. According to Jackson, the trial court's failure to begin with the presumption should be deemed harmless because he satisfied the *Lott* criteria. Jackson's argument is persuasive. However, as discussed below, the trial court's determination that Jackson satisfied *Lott's* first criteria of demonstrating significant subaverage intellectual function is based on a misinterpretation of the facts presented, and failed to account for the opinions of other experts. Additionally, the trial court's conclusion of intellectual disability is inconsistent with the evidence upon which it relied to make this conclusion.

### 3. Significant Subaverage Intellectual Functioning Finding

{¶ 55} The first factor in *Lott* requires that Jackson prove by a preponderance of the evidence that he has significant subaverage intellectual functioning. The trial court determined that Jackson "exhibits substandard intellectual functioning" by relying solely on Dr. Everington's 1992 assessment and Dr. Smith's 2016 evaluation and expert opinion. The reports of Drs. Everington and Smith may be relevant and lend credence to a finding of subaverage intellectual functioning, but the trial court's findings regarding these reports are incomplete and mistaken.

**{¶ 56}** First, the trial court characterized and classified Dr. Everington's Q-SAT assessment score as an IQ score and relied on it as such. The Q-SAT is an achievement test that measures academic ability and was utilized as a measure of Jackson's adaptive skills deficits. In fact, Dr. Aronoff reported and testified that he deferred to Dr. Everington's findings on her adaptive skills testing.

**{¶ 57}** Jackson concedes that a Q-SAT is not an IQ test, but contends this was merely a misidentification and that the trial court did not rely on the Q-SAT score in reaching its conclusion. We disagree. The trial court's opinion is replete with the court's understanding and application that Dr. Everington's assessment was an IQ score. First, it notes that Jackson "has been administered *six* official intelligence tests." (Emphasis added.) To achieve this number, Dr. Everington's test was necessarily included. Additionally, the court utilized this score in support of its determination that it would "give more weight to [Jackson's] IQ scores closer to the time of the offense than those obtained more recently." The court then specifically referenced that in "Dr. Everington's assessment, the assessment closest to the date of the actual offense, [Jackson] scored a 77." The court further relied on Dr. Everington's score as an IQ test in finding "influential in our determination that [Jackson] has significantly subaverage intellectual functioning because two of the IQ tests where [he] achieved a score higher than 70, the administering professionals (Dr. Everington and Dr. Smith) still opined that [Jackson] was functioning in the intellectual disabled range."

{¶ 58} Accordingly, the trial court arbitrarily relied on Dr. Everington's Q-SAT score as an IQ score in assessing whether Jackson has significant subaverage intellectual functioning. Nevertheless, this reliance could be harmless if the trial court's remaining findings and conclusion on the first *Lott* factor are supported by other competent and credible evidence. Accordingly, excising Dr. Everington's testing score from consideration, the trial court's opinion then only relied on Dr. Smith's IQ results and conclusions. We find this problematic because Dr. Smith's expert opinion is inconsistent with the trial court's own determinations and conclusions.

{¶ 59} First, the trial court explicitly stated it would give more weight to Jackson's IQ scores closer to the time of the offense rather than those obtained more recently. Accordingly, relying solely on Dr. Smith's score, a score obtained in 2016 and farthest from the offense, is contrary to the court's own noted consideration.

{¶ 60} Additionally, the trial court placed much weight on Dr. Smith's report and testimony and concluded that Dr. Smith was likely able to obtain a reliable score because Jackson told Dr. Smith that he did not want to be classified as intellectually disabled. Dr. Smith administered the S-BV to Jackson, he achieved a full-scale IQ score of 80. Dr. Smith testified that there is a 95% confidence interval of 76 to 84. (Tr. 198.) Considering the standard error of measurement, these scores would satisfy *Lott's* rebuttable presumption that Jackson is not intellectually disabled.

{¶ 61} We also find that the trial court's finding that Jackson's S-BV IQ score is "subaverage for a person of the [Jackson's] age," is contrary to the evidence. The

trial court stated that "significantly subaverage intellectual functioning" is performance that is at least two standard deviations below the average level for an individual's peers. However, Jackson's S-BV IQ score is not "subaverage" because Dr. Smith testified that two standard deviations below the average on a S-BV test is a score of 68. In this case, Jackson scored an 80, and even factoring the SEM, the lower range would be 76. Despite Dr. Smith's testimony and test results, the trial court concluded that Jackson "exhibits substandard intellectual functioning."

{¶ 62} Finally, the trial court's reliance on Dr. Smith's expert report, which opined that Jackson currently is not intellectually disabled, is inconsistent with the court's own conclusion that Jackson is intellectually disabled. It is difficult to discern from the trial court's decision why it relied exclusively on Dr. Smith's evaluation and expert opinion, yet deviated, without justification, from Dr. Smith's conclusion that Jackson is not currently intellectually disabled.

{¶ 63} We also find that the trial court arbitrarily rejected the expert testimony and opinions of Drs. Aronoff and Dreyer based on the trial court's explicit reliance on and citation to Drs. Everington and Smith's assessments and reports regarding the first *Lott* criteria. "A trial court is not required to automatically accept expert opinions offered from the witness stand, whether on [intellectual disability] or on any other subject." *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 71. "Nevertheless, expert opinion 'may not be *arbitrarily* ignored, and some reason must be objectively present for ignoring expert opinion testimony.'" (Emphasis sic.) *Id.*, quoting *United States v. Hall*, 583 F.2d 1288, 1294

(5th Cir.1978); *State v. Brown*, 5 Ohio St.3d 133, 134-135, 449 N.E.2d 449 (1983) (trial court erred by disregarding expert opinions that defendant was insane, in the absence of evidence to the contrary). The trial court did not make any finding that Drs. Aronoff or Dreyer lacked either credentials or credibility. And while the trial court as the trier of fact may disregard expert opinion, it may not arbitrarily exclude, without justification, expert opinions without indicating why the opinions were not considered.

### 4. Conclusion

{¶ 64} Accordingly, we find that the trial court did not adhere to the *Lott* test when it failed to identify and address the rebuttable presumption. Further, the trial court's decision mistakenly characterized the Q-SAT score as an IQ score in evaluating whether Jackson has significant subaverage intellectual functioning. This reliance is exacerbated by the trial court's own inconsistency in its determination that IQ scores achieved closer in time to the offense would be given greater weight, but then relied on a 2016 score that, even if the court applied the standard error of measurement, would admittedly place Jackson in the presumption of no intellectual disability. Finally, the trial court arbitrarily rejected, without justification, the expert opinions of Drs. Aronoff and Dreyer in its finding that Jackson exhibits significant subaverage intellectual functioning. These errors misapplied the correct legal standard and relied on erroneous findings of fact; thus, constituting an abuse of discretion.

{¶ 65} Despite these errors, this court is not of the opinion that the trial court's decision is completely unsupported by competent and credible evidence that would require reversal of the trial court's decision and reinstate Jackson's death sentence. Further review is warranted.

## V. Application of *Ford*

{¶ 66} After the state filed its appellate brief, but prior to Jackson filing his appellate brief, the Ohio Supreme Court decided *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616 (2109) which overruled *Lott*, created a new standard for determining intellectual disability for persons subject to the death penalty, and held that there is no longer a presumption in Ohio "that a defendant is not intellectually disabled if his or her IQ score is above 70." *Id.* at ¶ 97.

{¶ 67} In support of its decision to overrule *Lott*, the *Ford* court considered updates to two medical treatises in their standards and definitions of intellectual disability. *Id* at ¶ 46, citing American Association on Intellectual and Development Disabilities, *User's Guide to Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports* (11th Ed.2010) ("AAIDD"); American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed.2013) ("DSM-5"). The *Ford* court noted that these updated definitions and standards were recognized in two post-*Atkins* United States Supreme Court decisions that struck down state-court decisions on intellectual disability. *See Hall v. Florida,* 572 U.S. 701, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014) (invalidating Florida law that precluded presentation of additional evidence of

intellectual disability when the offender scored above 70 on IQ tests), and *Moore v. Texas*, ___U.S.___, 137 S.Ct. 1039, 197 L.Ed.2d 416 (2017) (striking down decision that relied on an outdated definition in assessing whether a defendant was intellectually disabled).  As a result of *Hall* and *Moore*, trial courts are required to consider the SEM when evaluating a defendant's IQ score because "an individual's intellectual functioning cannot be reduced to a single numerical score" — it is "a range of scores on either side of the recorded score."  *Hall* at 713.

{¶ 68} Using as guidance the updated definitions and diagnostic standards, and a recent Kentucky decision that identified and implemented various aspects of the decisions in *Hall* and *Moore*, the Ohio Supreme Court set forth a new standard for courts to apply when determining intellectual disability for purposes of eligibility for the death penalty.  *Id.* at ¶ 99, citing *Woodall v. Commonwealth*, 563 S.W.3d 1 (Ky.2018).  The court stated:

> For purposes of eligibility for the death penalty, a court determining whether a defendant is intellectually disabled must consider three core elements:  (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean — i.e., a score of roughly 70 or lower when adjusted for the standard error of measurement, (2) significant adaptive deficits in any of the three adaptive-skill sets (conceptual, social, and practical), and (3) the onset of these deficits while the defendant was a minor.

*Id.* at ¶ 100.

{¶ 69} Recognizing this new standard and that the *Ford* decision was released during the state's appeal in this case, this court sua sponte ordered the parties to brief the impact of *Ford* on the assignments of error and issues raised on

appeal. In its supplemental brief, the state contends that this court should not apply *Ford* because the trial court did not consider Jackson's petition under the *Ford* standard. Nevertheless, the state contends that even if this court considers the appeal under the *Ford* standard, it does not remedy the trial court's errors. Jackson contends that *Ford* is a more lenient standard and thus, its application would not warrant reversal of the trial court's decision.

{¶ 70} When the Ohio Supreme Court decided *Ford*, it did not address the merits of Ford's *Atkins* claim under the *Lott* standard. It recognized that the *Lott* criteria and definitions were outdated and needed to be reevaluated considering recent United States Supreme Court cases and updated diagnostic standards. After it established the new standard for *Atkins* hearings, the Supreme Court remanded the case to the trial court to consider whether Ford was intellectually disabled using the new framework; it did not apply the new standard to the evidence and testimony in the record.

{¶ 71} Accordingly, much like in *Ford*, we reverse the trial court's decision and remand the matter to the trial court to consider the evidence and testimony in light of *Ford*. This court's review is for an abuse of discretion, not de novo; accordingly, it would be inappropriate for this court to review the record as a whole and render an opinion utilizing a standard that the trial court did not consider.

{¶ 72} This court recognizes, however, that the standard in *Ford* seemingly is less stringent by removing the IQ-based presumption of intellectual disability, requires consideration of an adjustment for the standard error of measurement

when evaluating IQ scores, and removes the requirement that a second adaptive skill deficit must be identified. And although this court ordered the parties to brief the effect of *Ford* on the state's assignments of error, we recognize that the trial court's opinion heavily relied on "IQ evidence" that was admittedly not an IQ test, arbitrarily discounted without explanation the reports and opinions of other experts in the court's consideration of whether Jackson exhibits significant subaverage intellectual functioning, and made a finding that Jackson is currently intellectually disabled without discussing its justification for deviating from the expert opinions that found Jackson not intellectually disabled.

{¶ 73} We recognize that *Ford* does not require unanimity of expert opinion — "the legal determination of intellectual disability is distinct from medical diagnosis. '[T]his determination is informed by the views of medical experts,' but '[t]hese views do not dictate the court's decision.'" *Ford* at ¶ 85, citing *Hall* at 721. However, the trial court cannot arbitrarily ignore expert opinion and testimony, whether weighing in favor of finding intellectual disability or weighing against. *See generally Ford* at ¶ 85, 92 (failing to discuss the Flynn Effect when evidence is presented; and failing to consider lower IQ scores when higher scores were also presented). Of course, it is within the trial court's discretion in deciding which evidence and testimony it finds determinative. *Id.* at ¶ 85.

{¶ 74} Accordingly, we find merit to the state's first assignment of error, and find the state's second assignment of error challenging the trial court's findings regarding adaptive skill deficits moot. The trial court's decision is reversed, and the

case is remanded to the trial court for consideration of Jackson's *Atkins* petition under the standard set forth in *Ford.* In doing so, the court may consider additional evidence, but it shall consider all the evidence in the record, and in its discretion, give weight to or discount evidence and testimony where it deems appropriate.

{¶ 75} Judgment reversed and remanded.

It is ordered that the parties share equally in the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

MARY J. BOYLE, P.J., and
RAYMOND C. HEADEN, J., CONCUR